IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

JOSE MORAN,
            Plaintiff,

-vs-

TYLER SUMMERS, in his individual
capacity, and CITY OF
PFLUGERVILLE,
            Defendants.

CAUSE NO.:
A-15-CA-00769-SS

## ORDER

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically Defendants City of Pflugerville and Officer Tyler Summers' Motion to Dismiss [#28], Plaintiff Jose Moran's Response [#39] in opposition, and Defendants' Reply [#40], as well as Officer Summers' Motion for Summary Judgment [#29] and the City's Motion for Summary Judgment [#30], Moran's Consolidated Response [#38] in opposition, and Defendants' Consolidated Reply [#42] in support.[1] Having reviewed the documents, the governing law, and the file as a whole, the Court now enters the following opinion and orders.

### Background[2]

This case involves Section 1983 claims for violations of the Fourteenth Amendment right to due process, as well as claims for violations of the rights secured by the Americans with Disabilities Act (ADA) and the Rehabilitation Act (RA). The crux of Plaintiff Jose Moran's suit

---

[1] The Court also considered Moran's Unopposed Motion for Leave to File Consolidated Response [#37] and Defendants' Unopposed Motion for Leave to Exceed Page Limitation [#41], which it hereby GRANTS.

[2] Although Defendants filed a consolidated motion to dismiss contemporaneously with their separate motions for summary judgment, the Court will address the claims against Defendants pursuant to the summary judgment standard contained in Federal Rule of Civil Procedure 56. For purposes of a summary judgment motion, any disputed facts are viewed "in the light most favorable" to Moran, the nonmoving party. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014).



is his claim that Officer Tyler Summers denied him medical care when he failed to check Moran into the emergency room subsequent to his arrest, after which Moran wandered outside, into the street, and was struck by a hit-and-run driver.

At approximately 7:32 p.m. on September 3, 2013, Moran was involved in a single-car collision near 1600 Settlers Valley Road in Pflugerville, Texas. Summers' Mot. Summ. J. [#29-1] Ex. A (Summers Decl.) ¶ 3.[3] Several officers responded to the accident, including Officer Summers of the Pflugerville Police Department. *Id.* Officer Summers investigated the scene of the accident and spoke with Moran, who informed Officer Summers he was diabetic. Resp. [#38-3] Ex. 2 (Police Dept. Records) at 19–20; *id.* Ex. 7 (Summers Dep.) at 36:6–11. EMS personnel on the scene offered Moran treatment and transport to the hospital, but he refused treatment three times. Summers' Mot. Summ. J. [#29-1] Ex. E (EMS First Response Records) at 147.

According to Moran, at the time of the accident, he had not taken his insulin in three days[4] and, in fact, was on his way to pick up his insulin from the pharmacy when the accident occurred. *Id.* Ex. 1 (Moran Decl.) ¶¶ 8–10. Moran was diagnosed with type II diabetes in 1996 and is aware that when he fails to take insulin, his blood sugar rises. *Id.* ¶ 3. When his blood sugar is too high, he "get[s] confused," has trouble "standing upright," and "walking in a straight line." *Id.* ¶ 6. Moran testified that when he is in this condition, he has trouble "thinking clearly" and taking care of himself, so he will generally ask a friend to help him seek medical attention. *Id.* ¶¶ 6–7.

---

[3] Because Officer Summers and the City filed identical appendices in support of their separate motions for summary judgment, the Court will cite to the evidence provided in Officer Summers' appendix.

[4] There is conflicting evidence in the record on this point. According to Officer Summers' dash cam video, Moran told Officer Summers at the scene of the accident he had been without insulin for two weeks, not three days. Summers' Mot. Summ. J. [#29-1] Ex. A-3 (Summers' Dash Cam) at 20:38:31.

2

Moran further admitted to Officer Summers that he had one beer around 4:30 p.m. that afternoon. Police Dept. Records at 19. He advised Officer Summers that because of his diabetes, one beer "was too much for him." *Id.* Suspecting Moran of driving while intoxicated, Officer Summers asked Moran to perform two field sobriety tests. *Id.* The parties dispute whether Moran actually performed these tests. Resp. [#38] at 3. Moran contends he informed Officer Summers he could not do the field sobriety tests "because of [his] diabetes." Moran Decl. ¶ 11. According to Officer Summers' report, however, Moran performed two field sobriety tests and exhibited several signs of intoxication. Police Dept. Records at 19–20. Officer Summers then asked Moran if alcohol was a factor in the collision, and Moran stated it probably was. *Id.* at 20. The parties agree that Officer Summers then took Moran into custody and informed Moran he was under arrest for driving while intoxicated. *Id.*; Moran Decl. ¶ 13. Officer Summers then transported Moran to the Travis County jail. *Id.*

Officer Summers and Moran arrived at the jail at 9:04 p.m. Summers' Dash Cam at 21:04:05. Around 11:00 p.m., Nurse Cathy Garcia evaluated Moran and determined his blood sugar was 435. Resp. [#38-3] Ex. 13 (Garcia Decl.) ¶ 6. Garcia testified that a normal blood sugar level for someone without diabetes is between 70 and 110. *Id.* ¶ 10. She further testified that because Moran's blood sugar of 435 seemed comparatively high, there were moderate ketones present in his urine, and Moran appeared to be under the influence of alcohol, Garcia believed Moran's medical condition was unstable and therefore refused to book him as an inmate. *Id.* ¶¶ 9–10. Accordingly, Garcia directed Officer Summers to take Moran to the emergency room in Brackenridge Hospital for treatment. *Id.* at ¶ 11.

During the short car ride from the jail to the hospital, Officer Summers maintained a conversation with Moran, wherein he told Moran he had two choices: Officer Summers could

3

either accompany Moran to the hospital and then return him to the jail, or Officer Summers could release Moran in order to receive the medical attention he needed. Summers' Dash Cam at 23:24:55. When Officer Summers asked Moran if he would refuse treatment at the hospital, Moran replied he would not. *Id.* at 23:25:34. Moran expressly stated,

> I'm not going to refuse the treatment. I mean I'm fully, fully knowledgeable guy so I'm not going to refuse anything. For real. For real. And I am glad that you understand me how my situation is and you're willing to take me to the hospital to be checked out for medical issues. I don't refuse anything.

*Id.* at 23:25:30–23:26:15.

In his deposition, Officer Summers testified he believe Moran had sobered up since his initial arrest and could describe his medical needs to the hospital staff. Summers' Mot. Summ. J. [#29-1] Ex. F (Summers Dep.) at 93:17–23. Officer Summers further believed that if it were an emergency situation, Garcia would have called an ambulance to take Moran to the hospital. *Id.* at 31:24–32:9.

Moran, however, maintains he was not lucid during this car ride, and in fact, does not remember this conversation with Officer Summers or the ensuing "rambling soliloquy," wherein Moran talked about needing a police escort to pick up his things from his wife's house the following day. Moran Decl. ¶ 17. At his deposition, Moran explained he has never been married. Resp. [#38-3] Ex. 14 (Moran Dep.) at 28:19-21. In support of Moran's contention that he was disoriented during the car ride, Moran points to his hospital medical records, which reveal that twenty minutes after Moran was dropped off at the hospital, his blood alcohol level was still .09. Summers' Mot. Summ. J. [#29-1] Ex. C (Brackenridge Records) at 106.

At 11:29 p.m., Officer Summers and Moran arrived at the hospital. Summers' Dash Cam at 23:29:58. The parties agree Officer Summers left the hospital at 11:32 p.m.—just over two minutes after he arrived—and during that time, Officer Summers exited the vehicle, assisted

Moran out of the car, removed his handcuffs, and retrieved Moran's possessions from the trunk of his car. Moran Decl. ¶ 18; Summers Dep. at 38:13–39:23; Summers Dash Cam at 23:30:15. At this point the parties' stories diverge. According to Officer Summers, he expressly told Moran he was released from custody before walking Moran up ten stairs and through a door to the entrance of the emergency room, where he saw Moran speak with a hospital staff member. Summers Dep. at 40:4–42:4. He then returned to his car and drove away. Moran, however, maintains that Officer Summers did not tell him he was released from custody and simply instructed Moran to "go check yourself in." Moran Decl. ¶¶ 20–21. Thus, according to Moran, Officer Summers did not escort Moran inside the emergency room, nor did he tell any medical provider of Moran's condition. Id. ¶ 21.

Moran previously testified that after Officer Summers dropped him off, he entered the emergency room and spoke with a woman at the front desk. Summers' Mot. Summ. J. [#29-1] Ex. D (Moran Dep.) at 155:11–16. He did not tell anyone at the emergency room he was diabetic. Id. at 170:25–171:1. Moran took a seat in the lobby and waited approximately fifteen to twenty minutes. Id. at 156:6–8. Moran then told a nearby patient to save his seat and walked outside to "get some fresh air." Moran Decl. ¶ 24. Moran contends this is the last thing he remembers before waking up in the hospital. Id. Although Moran waited in the lobby for some time, "no one at Brackenridge ever knew Moran had arrived, had extremely high blood sugar, and needed medical treatment." Resp. [#38] at 8.

Shortly before midnight, Moran was hit by a hit-and-run driver. Id. Ex. 4 (Austin Police Department Records) at 68. EMS records reveal Moran was found in the middle of the road on the opposite side of the hospital, "unconscious . . . [and] bleeding from a severe laceration to the

5

front of his head." *Id.*; Summers' Mot. Summ. J. [#29-1] Ex. H (EMS Second Response Records) at 197. He was transported back to the hospital. EMS Second Response Records at 197.

On intake at the hospital, a Hemoglobin A-1c test was conducted, which provides a 2–3 month average of blood sugars. Brackenridge Records at 46. According to Moran's physicians' records, the goal of a Hemoglobin A-1c test is to achieve a reading below 7.0. *Id.* at 46. Moran's Hemoglobin A-1c on the night he was admitted to the hospital was 14. *Id.* at 106. As noted above, Moran's blood alcohol concentration was 0.09. *Id.* Moran was not released from the hospital until September 19, 2013. *Id.*

On September 1, 2015, Moran filed a lawsuit against Officer Summers in his individual capacity, the City, and Seton Family Hospitals (Seton). *See* Compl. [#1]. Subsequently, the Court granted Moran's motion to dismiss his claims against Seton with prejudice. *See* Pl.'s Agreed Mot. Dismiss [#12]; Order of Nov. 10, 2015 [#13]. In his complaint, Moran alleges Officer Summers violated his Fourteenth Amendment right to due process by being deliberately indifferent to his medical needs. Compl. [#1] ¶¶ 30–35. As to the City, Moran contends it violated his constitutional rights by "fail[ing] to train officers that patients in custody must be admitted to the hospital, not merely left on the curb at the hospital." *Id.* ¶ 38. Moran further claims the City intentionally discriminated against Moran in violation of the ADA and RA by failing to provide him with reasonable accommodations, "such as admission to or monitoring at the hospital when his blood sugar was dangerously high." *Id.* ¶ 46.

Defendants separately moved for summary judgment. Officer Summers argues the Court should grant summary judgment in his favor because he is entitled to qualified immunity, while the City contends summary judgment is warranted because no policy or practice was adopted with deliberate indifference to Moran's clearly established constitutional rights. *See* Summers'

Mot. Summ. J. [#29] at 16; City's Mot. Summ. J. [#30] at 7–12. These motions have been fully briefed and are now ripe for the Court's consideration.

## Analysis

### I. Legal Standards

#### A. Summary Judgment

As noted, Defendants submitted their motion to dismiss on the same date they filed their separate motions for summary judgment. These motions—which involve the same substantive issues—were filed sixteen months after Moran filed his original complaint and just two months before the close of discovery. Notably, in briefing Defendants' summary judgment motions, both parties submitted a significant amount of evidence in the form of affidavits, deposition excerpts, and police reports. Because the lawsuit is no longer in its earliest stages, and because the Court has before it evidence outside the pleadings, the Court finds it appropriate to address Moran's claims pursuant to the summary judgment standard set forth in Federal Rule of Civil Procedure 56. *See Barrett v. Harrington*, 130 F.3d 246, 252 (6th Cir. 1997) (affirming district court's decision to address defendant's motion for summary judgment rather than her motion to dismiss, where defendant filed both motions contemporaneously "more than four months after Plaintiff filed his original complaint, and after the parties had completed discovery").

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*

"Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing

sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

**B.     Section 1983**

Section 1983 provides a cause of action to individuals whose federal rights have been violated by those acting under color of state law. *Doe v. Dall. Indep. Sch. Dist.*, 153 F.3d 211, 215 (5th Cir. 1998). Section 1983 is not itself a source of substantive rights; rather, it merely provides a method for vindicating federal rights conferred elsewhere. *See Albright v. Oliver*, 510 U.S. 266, 271 (1994). In order to state a claim under Section 1983, a plaintiff must (1) allege a violation of rights guaranteed by the United States Constitution or federal law, and (2) show that the alleged deprivation was committed by a person acting under color of state law. *Doe*, 153 F.3d at 215.

**II.    Application**

**A.     Claim Against Officer Summers**

Officer Summers asserts qualified immunity in defense of Moran's Section 1983 claim that he was deliberately indifferent to Moran's medical needs. Qualified immunity protects public officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether qualified immunity applies, courts undertake a two-step analysis, asking "(1) whether facts alleged or shown by plaintiff make out the violation of a constitutional right, and (2) if so, whether that right was clearly established at the time of the defendant's alleged misconduct." *Pasco v. Knoblauch*, 566 F.3d 572, 579 (5th Cir. 2009). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was

unlawful in the situation he confronted." *Lytle v. Bexar Cty.*, 560 F.3d 404, 410 (5th Cir. 2009) (quoting *Saucier v. Katz,* 533 U.S. 194, 202 (2001) *overruled in part by Pearson v. Callahan,* 555 U.S. 223 (2009)).

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson,* 555 U.S. at 233. Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender,* 132 S. Ct. 1235, 1244 (2012) (internal quotation marks omitted). "[W]hile the Supreme Court has stated that 'courts should define the 'clearly established' right at issue on the basis of the 'specific context of the case,' it has also recently reminded [courts] that [they] 'must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions.'" *Luna v. Mullenix,* 773 F.3d 712, 724–25 (5th Cir. 2014) *rev'd on other grounds by* 136 S. Ct. 305 (2015) (quoting *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014)).

The gravamen of Moran's Section 1983 suit is his claim that Officer Summers denied Moran access to medical care in violation of his constitutional rights. Generally, the Due Process Clause of the Fourteenth Amendment does not place affirmative duties on the state. *See, e.g., DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989) (rejecting the notion of a state-created duty where the plaintiff had been released from the state's physical custody). For instance, the state has no affirmative duty to fund medical services for the general public. *See, e.g., Harris v. McRae*, 448 U.S. 297, 317–318 (1980) (no obligation to fund abortions or other medical services). In *Estelle v. Gamble*, however, the Supreme Court recognized a critical

10

exception to this rule. 429 U.S. 97 (1976). There, the Supreme Court held the state has an "obligation to provide medical care for those whom it is punishing by way of incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Id.* at 103. The *Estelle* Court therefore concluded that the Eighth Amendment's prohibition against cruel and unusual punishment, made applicable to the states through the Due Process Clause of the Fourteenth Amendment, mandates that states provide adequate medical care to all of their prisoners. *Id.* at 104–05. This right has been extended to pretrial detainees. *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 643 (5th Cir. 1996).

In this case, the parties dispute whether Moran, a pretrial detainee, was in custody after Officer Summers released him in front of the emergency room, and if not, whether Officer Summers still owed Moran a duty to provide medical care after his release from custody. As an initial matter, the Court concludes Moran was not, as a matter of law, in custody when he was released in front of the emergency room, nor was he in custody when he later wandered outside the hospital and was struck by a hit-and-run driver. It is undisputed that Officer Summers removed Moran's handcuffs and handed him his belongings. Though Moran maintains Officer Summers did not explicitly tell him he was no longer under arrest, Moran admits to turning around to see Officer Summers driving away. Moran has pointed to no evidence to plausibly suggest he was still in custody when Officer Summers "put[] the car in reverse, and dr[ove] away" after releasing Moran. Resp. [#38] at 7.

Therefore, the Court must determine whether Officer Summers had a duty to provide Moran medical care after he was released from custody. In support of his claim, Moran relies on *Wakefield v. Thompson*, 177 F.3d 1160 (9th Cir. 1999), for the proposition that the constitutional obligation to provide medical care to prisoners extends, in certain circumstances, to pretrial

detainees after they are released from custody. However, neither the Fifth Circuit nor the Supreme Court has recognized such a right. The Ninth Circuit is the only federal appellate court to have done so.[5] *Wakefield*, 177 F.3d at 1164.

In *Wakefield*, the Ninth Circuit, relying on *Estelle* and *DeShaney*, concluded the state maintains some, if very limited, duties to provide medical care following a prisoner's release from custody. *Id.* Of particular concern to the Ninth Circuit was the transitional period during which a prisoner may not, because of recent restriction on his liberty, quickly obtain necessary medical care on his own accord. *Id.* ("[A] prisoner's ability to secure medication 'on his own behalf' is not necessarily restored the instant he walks through the prison gates and into the civilian world."). The court reasoned that, because it could take a parolee days or even weeks to obtain new medication, "the period of time during which prisoners are unable to secure medication 'on their behalf' may extend beyond the period of actual incarceration." *Id.* Accordingly, the court held the state was required to provide the plaintiff with enough medication to cover the period of time "reasonably necessary to permit him to consult a doctor and obtain a new supply." *Id.*; *see also Haley v. Cty. of Del Norte, Cal.*, No. C 08-04572, 2009 WL 3568897, at *8 (N.D. Cal. Oct. 30, 2009) (denying an officer qualified immunity where the officer released the plaintiff from custody after learning the plaintiff needed urgent surgery); *Lugo v. Senkowski*, 114 F. Supp. 2d 111, 115 (N.D.N.Y. 2000) (applying *Wakefield* and concluding that where the plaintiff was paroled while awaiting surgery, the state owed the plaintiff a limited duty of protection beyond his period of incarceration).

---

[5] Other courts have recognized a duty to protect a prisoner after his release from custody where the state continues to impose limitations on the individual's freedom, such as through parole or supervised release. *See, e.g., Jacobs v. Ramirez*, 400 F.3d 105, 106 (2d Cir. 2005). *Wakefield*, however, is the only appellate opinion the undersigned located that expressly extends the state's affirmative duty to provide medical care to prisoners once they are released from custody.

Because the right recognized in *Wakefield* and its progeny has not been recognized by the Fifth Circuit, this Court is not bound by those decisions. Indeed, at least one district court in this circuit has reached the opposite conclusion of the Ninth Circuit in *Wakefield*, holding instead that "[o]nce the prisoner is released from custody," the rationale of *Estelle* and *DeShaney* no longer exists. *See Smith v. City of Tupelo, Miss.*, No. 1:05-CV-226-D-D, 2007 WL 2071811, at *6 (N.D. Miss. July 19, 2007) (concluding the defendant-officials did not owe the plaintiff a duty to provide medical care once he was released from custody, but holding in the alternative that even if the duty existed, the plaintiff failed to show the officials violated the duty).

However, even assuming there is a duty to provide medical care to pretrial detainees after their release, Moran has failed to show Officer Summers violated this duty. To establish a violation of his constitutional right to medical care as a pretrial detainee, Moran must show Officer Summers acted with "deliberate indifference to serious illness or injury." *Id.* "Deliberate indifference is an extremely high standard to meet." *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). It encompasses "only 'unnecessary and wanton infliction of pain' or acts 'repugnant to the conscience of mankind.'" *Tamez v. Manthey*, 589 F.3d 764, 770 (5th Cir. 2009) (quoting *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997)). To show deliberate indifference, Moran must present evidence (1) the defendant had subjective knowledge of "facts from which an inference of substantial risk of serious harm could be drawn"; (2) the defendant drew that inference; and (3) the defendant's response to the risk indicates he subjectively intended the harm to occur. *Estate of Allison v. Wansley*, 524 F. App'x 963, 970 (5th Cir. 2013). Mere negligence or even a grossly negligent response to a substantial risk of serious harm is not enough to establish deliberate indifference. *Id.*

As to the first element of deliberate indifference, there is no doubt that Officer Summers believed Moran was under the influence of alcohol at the time of the single-car collision, and it is clear from the record that Officer Summers knew Moran's blood sugar was very high at the time Garcia advised Officer Summers to take Moran to the emergency room. Officer Summers later explained he believed Moran "had sobered up" by the time he released Moran at the hospital. Summers' Mot. Summ. J. [#29] at 6. He points to the dash cam video of their conversation on the way to the hospital to support his belief that Moran was not "a danger to himself" or anyone else. *Id.* at 15. The Court has reviewed this video evidence, and concludes that at the very least, a fact issue remains as to whether this conversation is sufficient to counter evidence that Officer Summers was subjectively aware of a substantial risk of serious harm to Moran.

Nevertheless, Moran has failed to satisfy his burden of proof on the third element of deliberate indifference—that Officer Summers' response indicates he subjectively intended the harm. Unlike *Wakefield*, this is not a case where the plaintiff's ability to seek medical care was curtailed by previous restrictions on his liberty. Officer Summers did not restrict Moran's freedom but instead released him in front of the emergency room, where it is undisputed Moran waited for some time to receive care before wandering outside. Moreover, this case is distinct from *Haley*, where the court found there was a fact issue as to whether the officer temporarily released the plaintiff prior to a scheduled surgery simply to avoid paying for the surgery. In this case, Moran has failed to point to any facts which suggest Officer Summers failed to check him into the hospital in attempt to sidestep a potentially large hospital bill.

To the contrary, this case is similar to *Smith*, where the officials made arrangements to ensure the plaintiff would receive proper medical care after his release. Here, Officer Summers drove Moran to the hospital, and during the trip, questioned Moran to ensure he would seek the

treatment he needed. The video evidence of this conversation reveals Moran understood his medical needs and would consent to treatment at the hospital. Although Officer Summers did not walk Moran to the emergency room door, Moran, by his own account, entered the emergency room, spoke with a woman at the front desk, and waited in the lobby for some period of time before leaving the hospital. Officer Summers could not have known Moran would wander outside the emergency room and into the street, where he would be struck by a hit-and-run driver. As a result, Officer Summers did not knowingly disregard a substantial risk of serious harm.

Finally, even if Moran has established a constitutional violation under the right set forth in *Wakefield*, Officer Summers is nevertheless entitled to qualified immunity. The Fifth Circuit has not expressly recognized this right, and the district court's holding to the contrary in *Smith* indicates the law is far from clearly established in this circuit. *See Wilson v. Layne*, 526 U.S. 603, 618 (1999) (stating that when judges disagree on constitutional questions it is unfair to subject officials to money damages for picking the wrong side in the debate). Accordingly, Officer Summers was not "on notice" that releasing Moran in front of the emergency room, rather than checking him into the emergency room, violated Moran's due process rights. *See Murray v. Earle*, 405 F.3d 278, 289 (5th Cir. 2005) ("Although there need not be prior case law directly on point for a constitutional right to be clearly established, the state of the law must be such that a reasonable officer would be on notice that his actions could violate a constitutional right."). Officer Summers' motion for summary judgment is therefore GRANTED.

**B. Claims Against the City**

**i. Section 1983 Claim**

Moran also names the City as a defendant for his Section 1983 claim, contending the City has a policy or practice of failing to ensure pretrial detainees receive necessary medical care and further failing to train officers to wait with an inmate at a hospital to ensure he receives medical care. To hold a municipality liable for a violation of the constitutional right to due process, a pretrial detainee must show (1) the municipal employee violated his clearly established constitutional rights with subjective deliberate indifference, and (2) this violation resulted from a municipal policy or custom adopted or maintained with objective deliberate indifference. *Flores v. Cty. of Hardeman, Tex.*, 124 F.3d 736, 738 (5th Cir. 1997). Moran points to Officer Summers' actions as a basis for holding the City liable. This Court has already concluded, however, that Moran failed to establish Officer Summers violated a clearly established constitutional right with subjective deliberate indifference. Accordingly, Moran's Section 1983 claim against the City fails as well.

**ii. ADA and RA Claims**

In addition, Moran contends the City violated the ADA and RA by denying him the benefits of its services and programs because of his diabetes. Both the ADA and RA are federal statutes which were designed to eliminate discrimination against individuals with disabilities.[6]

---

[6] The ADA states in relevant part:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132 (1995). A "public entity" is defined under the statute as "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government." *Id.* § 12131(1).

Similarly, the RA provides:

16

Because the ADA expressly provides "[t]he remedies, procedures and rights" available under the RA are also accessible under the ADA, "[j]urisprudence interpreting either section is applicable to both." *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000); *D.A. ex rel. Latasha A. v. Hous. Indep. Sch. Dist.*, 629 F.3d 450, 453 (5th Cir. 2010) ("Because this court has equated liability standards under § 504 [of the RA] and the ADA, we evaluate D.A.'s claims under the statutes together.").

To state a claim under either the ADA or RA, a plaintiff must allege that (1) he is a qualified individual; (2) who was excluded from participation in or denied the benefits of services, programs, or activities of a public entity; and (3) that the exclusion, denial, or discrimination was because of his disability. *Lightbourn v. Cty. of El Paso, Tex.*, 118 F.3d 421, 428 (5th Cir. 1997). A plaintiff must show intentional discrimination in order to recover compensatory damages under the ADA or RA. *Delano–Pyle v. Victoria Cty., Tex.*, 302 F.3d 567, 574 (5th Cir. 2002).

In this case, Moran claims "to participate in the 'program or service' of incarceration at the jail, Moran required the reasonable accommodation of a medical exam at [the hospital] that the City failed to provide him." Resp. [#38] at 20. However, the Court previously concluded Moran was not in custody after Officer Summers released him in front of the emergency room. Thus, Moran's ADA and RA claims appear to be based on two alleged exclusions: his exclusion not just from the benefits of incarceration, such as access to medical care, but his exclusion from

---

No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency.

29 U.S.C. § 794 (1995). Moran has produced evidence that the City received federal funds and is therefore subject to liability under the RA. *See* Resp. [#38-3] Ex. 12 (Byrne Justice Assistance Grant).

17

incarceration itself. Moran has cited no legal authority to support this novel theory of liability under the ADA and RA.

Even assuming *arguendo* that Moran is a qualified individual under the ADA and RA and he was entitled to the reasonable accommodation of medical treatment as a pretrial detainee, Moran has failed to show he was actually *denied* this accommodation. Indeed, Moran was first offered medical treatment and an EMS transport to the hospital at the scene of the single-car collision in Pflugerville, but Moran refused that treatment three times. EMS First Response Records at 147. Subsequently, Officer Summers transported Moran to the emergency room. During that transport, Moran promised Officer Summers he would not refuse treatment once he reached the emergency room. Summers' Dash Cam at 23:25:30–23:26:15. Moran admits he entered the emergency room, spoke with a woman at the front desk, and waited for some time in the lobby before ultimately failing to seek medical treatment. The City's two attempts to provide Moran with medical treatment, including an EMS transport to the hospital, strongly suggests the City did, in fact, provide Moran with access to medical treatment.

At bottom, however, Moran has not produced evidence that Officer Summers' failure to check Moran into the hospital was *because of* Moran's diabetes. To the contrary, the evidence shows Officer Summers released Moran in front of the emergency room because his presence was required in Pflugerville due to an increased number of emergency calls. *See* Summers Dep. at 85:6–86:1. The record reveals that at most, Officer Summers acted with negligence, not intentional discrimination, in failing to check Moran into the hospital once he released him from custody. Because Moran has failed to meet his burden to show violations of the ADA or RA, the City's motion for summary judgment on these claims is GRANTED.

## Conclusion

In sum, because Officer Summers is entitled to qualified immunity on Moran's claim that he was denied access to medical care in violation of his constitutional rights, the Court grants Officer Summers' motion for summary judgment. The Court likewise grants the City's motion for summary judgment on Moran's claims under Section 1983, the ADA, and the RA.

Accordingly,

IT IS ORDERED that Plaintiff Jose Moran's Unopposed Motion for Leave to File Consolidated Response [#37] and Defendants City of Pflugerville and Officer Summers' Unopposed Motion for Leave to Exceed Page Limitation [#41] are GRANTED;

IT IS FURTHER ORDERED that Defendants' Motion to Dismiss [#28] is DISMISSED AS MOOT;

IT IS FURTHER ORDERED that Defendant Officer Summers' Motion for Summary Judgment [#29] is GRANTED;

IT IS FURTHER ORDERED that Defendant City of Pflugerville's Motion for Summary Judgment [#30] is GRANTED; and

IT IS FINALLY ORDERED that Defendants' Motion to Exclude Expert Testimony [#43] and Plaintiff's Unopposed Motion for Extension of Time to Respond [#45] are DISMISSED AS MOOT.

SIGNED this the 10th day of April 2017.

                                                       _/s/ Sam Sparks_
                                                       SAM SPARKS
                                                       UNITED STATES DISTRICT JUDGE